LIVE STOCK STATE BANK, Appellant, v. MAUPIN et al, Respondents.

(226 N. W. 574.)

(File No. 5662. Opinion filed August 14, 1929.)

*Morrison & Skaug,* of Mobridge, for Appellant.
*P. M. Burns,* of Timber Lake, for Respondents.

MISER, C. Appellant is a Minnesota bank. In 1919, respondent Chas. A. Maupin and one Collins either bought cattle from the bank or bought cattle with money borrowed from the bank. They gave their notes in the sum of $14,500 therefor, secured by chattel mortgages on the cattle. A severe storm in March, 1920, caused a loss of 100 of these cattle. The approximately 80 head remaining furnished inadequate security for the loan. Respondent Caroline Maupin, wife of Charles, was not indebted on these notes. She owned in fee simple a quarter section of land in Dewey county. Charles owned an adjoining half section, subject

only to deferred payments owing to the United States government. On July 29, 1920, they executed a mortgage on each tract to secure the aforesaid indebtedness of $14,500. Caroline refused to execute the mortgages until an agreement was made that was satisfactory to her. Accordingly, on the same day the bank and Charles entered into a written agreement which, after reciting the date and the parties, was as follows:

"It is agreed between said parties that all cattle in possession of said second party, sold to him by first party in 1919, are to be shipped to market (So. St. Paul Market) about the 15th of August, 1920, and the proceeds of a sale of same are to be applied on the indebtedness now owing from second to said first party thereon.

"After such sale and credit applied, said first party agrees to furnish said second party, at a price agreeable to both parties, 125 head of calves, same to be furnished during the fall of 1920, and second party to give a chattel mortgage back to first party for an amount equal to the purchase price thereof.

"First party is to loan second party on this date the sum of Five Hundred Dollars, same to be secured by chattel mortgage on 100 tons of hay to be made by second party, then first party agrees to loan second party for cost of putting up additional hay not to exceed 200 tons and price thereof not to exceed $5.00 per ton, said last mentioned loan to be secured by chattel mortgage on said last mentioned hay.

"Second party agrees to break out 100 acres on the S.E. ¼ of Sec. 4, Twp. 15 N., Range 27 E., B. H. M., in Dewey County, S. D., and sow same to crop during the farming season of 1921 and said first party agrees to loan second party sufficient money at the time to provide seed for same, second party agrees to secure such loan by chattel mortgage back to first party on the crop on said breaking for the season of 1921; all chattel mortgages hereinbefore mentioned to be first security on any and all of said property so to be mortgaged.

"It is further agreed that if first party should refuse to furnish the 125 head of calves as herein agreed, then and in that event the real estate mortgages bearing even date herewith given by second party and wife to first party on E.½ of Sec. 33, T. 16 N., Range 27 E., and on S.E.¼ of Sec. 4, Twp. 15 N., Range 27 E., B. H.

M., in Dewey County, S. D., shall be null and void and of no effect.

"Live Stock State Bank,

"By W. A. Samels, Pres.

"Chas. A. Maupin

"Witness: P. M. Burns

"F. E. Koleski"

In September, Charles Maupin shipped about 50 head of the cattle to the South St. Paul market, and the proceeds thereof were applied on the original indebtedness of Maupin and Collins, leaving a balance on November 16, 1920, of $12,754.80, for half of which sum, to wit, $6,377.40, Charles and Caroline executed their note to the bank on November 16, 1920. This note was due on October 15, 1921. To secure the same, respondents again, on November 19, 1920, executed mortgages on the lands owned by them. On the same day, and to secure the same note, they executed to the bank as mortgagee their chattel mortgage on all the cattle owned by them, being about 50 head, and also on all the horses owned by them, also about 50 head. Appellant contends that it not only never refused to furnish the calves which in the contract it agreed to furnish as an inducement to respondents to execute the mortgages of July 29, 1920, but also that Maupin did not ship in all the cattle as he contracted to do. Maupin explains that when, in September, he shipped in to the South St. Paul market 50 head of cattle, the price of cattle had fallen so low that it was agreed between Samels, president of the bank, and himself, that he should keep the balance of the cattle until notified by Samels to bring them in. Acquiescence by the bank in Maupin's keeping of the cattle was indicated by its taking and filing of the chattel mortgage thereon on November 19, 1920. Samels himself testified as to his conversation with Maupin in November, 1920, as follows:

"He came down to see me, and I figured he was coming with the balance of the cattle, which we had a mortgage on; but he came down without the cattle and said he wanted to buy these calves; and I told him, all right, to go to the yards and get a bunch from Mr. Kirk. He left the bank and came again in the afternoon and said he had bought two loads of cattle from Tewey Brothers. I told him I thought he understood he was going to get calves; but he said he did not figure on that. He said it was a poor time to

bring out calves, that it was late, and he could hardly winter the calves and preferred heavier stock; and so I told him I would have the cattle looked over and see how they were. I sent Mr. Kirk to look the cattle over, and he reported to me; and after that I told Mr. Maupin I would not pay for such cattle. I told him they were a very poor class of cattle and that I would not put money into such security. I did not at any time refuse to buy for him 125 head of calves. The bank was always willing to furnish him 125 head of calves when the price was agreed upon."

Maupin testified that about November 19th Koleski, the assistant cashier of the bank, came to the ranch and told him the bank was ready to buy the cattle for him. After signing, at Koleski's request, the two real estate mortgages and the chattel mortgage on November 19, 1920, he (Maupin) went to St. Paul to get the cattle. There he had a conversation with Mr. Samels in the bank, as follows:

"Mr. Samels said there was a lot of cattle in that day and that I could probably get what I wanted. So I went down and bought somewhere around two carloads, and came back and told him what I had done. He would not stand for the deal. * * * I waited there the rest of the week, but did not see Mr. Samels. The following Monday, I saw Mr. Samels and asked him if he had heard from Mr. Koleski, but he said he had not. He said the papers did not get in and he did not know why. I said to him: 'I will tell you what I will do with you; I will leave the matter to you to buy the cattle and send them out, and we will let Johnnie Kirk, the commission man, buy them.' While we were talking, Mr. Kirk came in. The three of us then talked it over; and he was to buy these cattle and ship them out to Timber Lake and notify me by wire when they were to be shipped. I said that was all right. I told Mr. Samels that I had to have some money to get home, as I was broke. He loaned by $300 then, and I gave him the note for this amount. I got the money and went home that night; and I waited all fall, but the cattle never came."

On December 2, 1920, the chattel mortgage dated November 19, 1920, was filed and the two real estate mortgages dated on November 19, 1920, were recorded.

On January 13, 1921, Koleski, according to Maupin's testimony, told him that the mortgages drawn up in November had been lost

and that he had to draw up a new set. Having signed four real estate mortgages and a chattel mortgage as well as a note for $6,377.40 without having obtained any of the cattle which were the inducement for so obligating herself, Caroline Maupin objected to signing the joint real estate mortgage on January 13, 1921. Charles Maupin also told Koleski that he wanted the prior mortgages released before any new mortgages were put on. Koleski promised to furnish such releases. Maupin demanded that Koleski put this in writing. Accordingly, on behalf of the bank, Koleski wrote the following:

"January 13th, 1921.

"Charles Maupin: All mortgages and notes will be returned to you just as soon as these papers are received at the Live Stock State Bank, South St. Paul, Minnesota.

"F. E. Koleski."

Respondents both then signed another mortgage to the bank; this time mortgaging both tracts in the same instrument to secure the sum of $12,754.80. This mortgage was also recorded. When so recorded, the bank had five real estate mortgages on record executed by respondents within six months. The two on July 29, 1920, the two on November 19, 1920, and the one on January 13, 1921, covered the same land. The two real estate mortgages and the chattel mortgage of November 19, 1920, secured respondents' note for $6,377.40 due October 15, 1921. The real estate mortgage due January 13, 1921, secured this same note of respondents and a note signed by Collins and wife. So that not only did the mortgages cover the same land, but the payment of the debt secured by the mortgages of July 29, 1920, would have paid the notes secured by the mortgages of January 13, 1921, and of November 19, 1920.

Maupin testified that he wrote to Koleski on December 17, 1920, and produced a copy of a letter purporting to have been so sent, telling of the preparation he had made for the cattle, and saying: "I want you to write me a real Honest-to-God letter as to when I am to come into possession of these cattle we talked so much about, as oats and barns and such as that now seem to be without purpose." Koleski says he never received such a letter. On February 11, 1921, Maupin wrote to the bank demanding that the contract of July 29th be complied with, otherwise that suit would be brought to set aside all the mortgages above mentioned.

It does not appear that such a suit was begun by Maupin. The bank, however, began a suit against Maupin and wife on the note for $6,377.40, and asked foreclosure of the chattel mortgage and the two real estate mortgages of November 19, 1920. Defendants asked that the real estate mortgages be canceled because the bank had failed and refused to furnish the cattle, the condition for the execution of all of said real estate mortgages. The court decreed a money judgment against respondents and the foreclosure of the chattel mortgage, but held that the real estate mortgages should be canceled as void, because made under a contemporaneous agreement that the mortgages should be null and void if the bank refused to furnish respondents with 125 head of calves, and that the bank had failed and refused to furnish said calves as it agreed to do.

As is not unusual in cases where success has not attended the co-operative efforts of debtor and creditor to triumph over financial disaster, the evidence in this case discloses that all the fault was not with one party nor all the fair dealing with another. The trial court saw and heard the witnesses, examined all the exhibits, and was in far better position than is this court to weigh the evidence. There was ample evidence, if properly admissible, to support the finding of the trial court "that, at the time each of said real estate mortgages was signed, executed and delivered, it was understood and agreed between the plaintiff and defendants, and it was the intention of the said parties thereto that each of said real estate mortgages was to be null and void and of no effect, unless plaintiff furnished the defendants with the said 125 head of calves mentioned in said Exhibit 'C' (the contract of July 29, 1920, above set out) and that the plaintiff has wholly failed and refused to furnish the said defendants with the said 125 head of calves, as it agreed to do or at all."

Appellant contends that the evidence on which the foregoing finding was based was inadmissible; that even the mortgages of July 29, 1920, were free of condition. This contention is based on section 526, Rev. Code 1919, as follows: "A grant can not be delivered to the grantee conditionally. Delivery to him or to his agent as such is necessarily absolute; and the instrument takes effect thereupon discharged of any condition on which the delivery was made."

Appellant cites Sargent v. Cooley, 12 N. D. 1, 94 N. W. 576, as dealing with the identical question here at issue. But there is nothing in the statute cited, nor in Sargent v. Cooley based thereon, which holds that a mortgagor cannot, in writing, agree with his mortgagee that the mortgage shall be null and void, as between the contracting parties, should the mortgagee fail to keep the promise which induced the giving of the mortgage. The case of Sargent v. Cooley was not, as is this, an action between the mortgagor and the mortgagee, nor was there in that case, as in this, a writing signed by the mortgagor and mortgagee and contemporaneously delivered. Moreover, in passing, it may be observed that there is authority contra to Sargent v. Cooley. In 41 C. J. 427, after stating the general rule of the common law relating to deeds substantially as contained in section 526, Rev. Code 1919, and citing Sargent v. Cooley, the text proceeds thus: "On the other hand, it has been held that, where a mortgage is placed in possession of the mortgagee or his agent on an agreement that it is not to take effect unless certain conditions are performed, as that the property which the mortgagor is purchasing shall prove satisfactory when inspected, or that the mortgage and note secured thereby shall be returned to the mortgagor in case the contemplated loan is not made, there is no effective delivery of the mortgage if the condition is not performed."

Among the cases there cited, Garrison v. J. I Case Threshing Machine Co., 159 N. C. 285, 74 S. E. 821, 823, supports the text with high authority, quoting, inter alia, Ware v. Allen, 128 U. S. 590, 9 S. Ct. 174, 32 L. Ed. 563, where the court held that "parol evidence is admissible, in an action between the parties, to show that a written instrument, executed and delivered by the party obligor to the party obligee, absolute on its face, was conditional, and not itended to take effect until another event should take place."

The case of Ware v. Allen, supra, has been cited by the Supreme Court of the United States, the Circuit Court of Appeals, and the federal District Courts more than a score of times, the most recent appearing to be in Powers v. Maryland Casualty Co. (D. C.) 25 F. (2d) 890. In that case the court said:

"I am aware that the parol evidence rule is said to be more than a rule of evidence; that it is a rule of substantive law, and

rests on the doctrine that, when parties have deliberately put their agreements in the form of a written contract, they shall not be allowed to show that the agreement was something else. Mears v. Smith, 199 Mass. 319, 85 N. W. 165. I should doubt very much, however, whether this rule would forbid the introduction of evidence tending to show that a writing was but a part of an entire contract between the parties.

"But there are other grounds upon which the right to show the real intent of the parties may be based. It is well established that the parol evidence rule does not preclude a party from showing that what, on its face, purported to be an agreement was not to operate as such. The distinction between evidence to vary the terms of an agreement and evidence to show that no agreement existed is clearly pointed out in Ware v. Allen, 128 U. S. 590, 9 S. Ct. 174, 32 L. Ed. 563, where Mr. Justice Miller collected the authorities in England and in this country to support the principle that a written instrument, delivered to the obligee, may be shown to have been delivered with the understanding that it would have no operation as a legal, binding agreement, except upon some condition that had not been fulfilled. See, to the same effect, Burke v. Dulaney, 153 U. S. 228, 14 S. Ct. 816, 38 L. Ed 698; Brady v. Kern (D. C.) 218 F. 862, affirmed in (C. C. A.) 222 F. 873."

In Pyle v. Pyle, 260 Pa. 532, 103 A. 918, where, at the insistence of the mortgagor, the mortgagee indorsed on the back of the mortgage an agreement over his signature that the mortgage should become void if recorded during the lifetime of the mortgagor, it was held that the moment is was recorded automatically the breach of condition extinguished the mortgage. See, also, 41 C. J. 801.

Here the respondents executed not only the mortgages of July 29, 1920, but also the mortgages of November 19, 1920, and the mortgage of January 13, 1921, because appellant promised to furnish them cattle with which to work out from under the debt. That was the promise that induced respondent Charles Maupin to mortgage his homestead and induced Caroline Maupin to mortgage all the land she owned. On no other basis did the minds of the parties meet in all their dealings from July 29, 1920, until January 13, 1921, which constituted in effect but one transaction. To refuse to give effect to the condition which was part of the entire trans-

action, would be to make for them a contract which they did not choose to make for themselves.

The judgment of the trial court should be and is affirmed.

POLLEY and BURCH, JJ., concur.

CAMPBELL, J., and FULLER, C. (appointed in lieu of SHERWOOD, P. J., not sitting.

MISER, C., sitting in lieu of BROWN, J.